UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA : | : | |
| Plaintiff : | CIVIL ACTION NO. | |
| : | 3:08cr224 (AWT) | |
| VS. : | | |
| : | | |
| STAVROS GANIAS : | FEBRUARY 27, 2010 | |
| Defendant : | | |

-------------------------------------------------x

## **MEMORANDUM IN SUPPORT MOTION TO SUPPRESS EVIDENCE**

The defendant, Stavros Ganias, defendant in the above-entitled action, hereby files this Memorandum in support of his Motion to Suppress Evidence filed on this same date pursuant to Rule 12 (b)(3)(C) of the Federal Rules of Criminal Procedure.

The defendant, Stavros Ganias, is a former Internal Revenue Service agent who runs an accounting and tax preparation business located at 170 North Plains Industrial Road, Wallingford, Connecticut. At issue for purposes of the defendant's Motion to Suppress, are the two (2) court authorized warrant searches and seizures of the defendant's three business computers. The first warrant pertained to the court authorized search of the defendant's business premises for records pertaining to American Boiler Inc., and Industrial Property Management, Inc. The second warrant pertained to the court authorized search of three imaged hard drives of the defendant's computers, which were made and taken during the first search for business and tax records of the defendant Ganias and his business Taxes International.

A. <u>Warrant # 1: November 19, 2003</u>

The first warrant issued on November 17, 2003 and authorized the search of the defendant's business office located at 170 North Plains Industrial Road, Wallingford, Connecticut. The warrant

1

dealt with a search for the fruits, instrumentalities and evidence relating to the filing of false claims and or theft of government property involving American Boiler ("AB") and or Industrial Property Management ("IPM"). (A copy of the search warrant is attached hereto as "Exhibit 1)  The affidavit of Michael D. Conner, a supervisory agent with the Hartford Fraud Resident Agency, 701st Military Police Group (CID) purportedly set forth the probable cause for the issuance and permissible scope of said warrant". (A copy of the application and affidavit for search warrant is attached hereto as "Exhibit 2")

On November 19, 2003, a search of the defendant's business office was conducted by special agents from the U.S. Army CID, John Latham, James Rosenthal, Michelle Chowanwiec and Michael O'Connor. (A copy of the inventory of the search is attached hereto as "Exhibit 3")  Nowhere in the inventory does it mention a mirror image of the three hard drives of the defendant's computer was seized for further review.

  1. Lack of " probable cause" to support warrant:

 The warrant dealt with a search for the fruits, instrumentalities and evidence relating to the filing of false claims and or theft of government property involving Industrial Property Management ("IPM") and or American Boiler ("AB").  The warrant indicates that in 1998, "IPM" was initially awarded a $4.7 million dollar contract to provide security for and maintain the former Stratford Army Engine Plant (SAEP).  The contract was re-bid on September 30, 2002 and "IPM" lost the contract after competitive re-bidding process. Subsequent to the rebidding process "IPM" sued the Government over the contract and while this was pending the Government entered into a series of fixed price contracts with "IPM". (Affidavit ¶ 5)  It is of some import to note the fact that after September 20, 2002, "IPM" had a fixed price contract, that is, they had to perform the security work

2

and maintain the premises for one set dollar amount.

The warrant alleges that on August 20, 2003, special agent Carey received an anonymous report of a theft of U.S. Army property from the Stratford Army Engine Plant (SAEP). The anonymous caller was later identified and met with agent Cary on September 12, 2003 and is referred to in the affidavit as "CS-1". The items reported to be stolen were copper wire and work benches, two hydraulic piper benders and heating system pumps. (Affidavit ¶ 7)   Other than the bald assertion that the aforementioned items were stolen, there are no facts supporting how "CS-1" had come to this conclusion or opinion; that is, he doesn't say he witnessed the items being removed or stolen;  he doesn't say <u>when</u> they were taken or <u>how</u> they were taken from the plant; nor does he provide the names of others that would have seen the event.   The warrant mentions that "CS-1) is a current employee of "IPM".   The basis of his assertion of theft is therefore unknown and left to speculation by the reader of the affidavit.  There is nothing in the balance of the affidavit that would lead one to reasonably conclude or believe that the alleged stolen items would be in the accounting and tax preparation business office of the defendant, Ganias.

Paragraph 9 of the affidavit adds little or nothing to a reasonable belief that a crime has been committed by "IPM" and or McCarthy.  There is no assertion that anyone from "IPM" performed any work for "AB" during the pendency of any costs type contract, wherein their hours got billed to the Government illegally. The allegations at best, indicate that at times, one employee, Anna Memaj, possessed "AB" documents in her desk and allegedly performed work for "AB" during November 2003. (Affidavit ¶¶ 22-23)   This again was at the time "IPM" had a fixed price contract and it wouldn't have mattered if she worked 5 or 50 hours for "AB", because "IPM" only got a fixed fee for the security contract. Once again, it is interesting to note that the affidavit does not allege, nor

3

did the Army ever indicate, that any of these alleged inappropriate employee activities cost the Government any additional money under their price fixed contract with "IPM".

The affidavit is replete with one paragraph after another that adds nothing to support a reasonable determination that criminal activity occurred and evidence of such a crime could be reasonably found at the accounting office of the defendant, Ganias. Paragraph nine (9) alleges "AB" employees did work for "IPM' and signed in as employees of "Industrial and Mechanical Services". Nowhere in the affidavit does it allege that this conduct is unlawful or that work contracted for was not performed. Also alleged in paragraph nine (9) and ten (10) is the fact that the current environmental subcontractor for SAEP is a company owned by Richard Meier, an operations manager for "IPM" and Megan McCarthy, McCarthy's daughter. The affidavit does not allege that this relationship or conduct is in any way prohibited or unlawful.

Paragraph eleven (11) alleges in a conclusory fashion that duct work for Meier's personal residence was manufactured at "SAEP" and installed by "IPM" employees. Once again, no basis of knowledge on the part of "CS-1" is set forth in support of this allegation; there is no indication that "CS-1" witnessed the installation; no indication of a time frame when this allegedly occurred; no indication that he took part in the manufacturing of the item or that he was told by Meier that this in fact took place. The balance of the assertions set forth in paragraph eleven (11) show that the information of "CS-1" was based on nothing more than surmise and conjecture. Paragraph eleven (11) relates he "believed" Meier and "IPM" employees were going to Meier's residence and he "believed" the employee hours were billed to the "IPM" contract while they performed the work' yet no facts are set forth to credit or establish this belief.

4

The allegation that "CS-1" thought that the business was falsely certified as woman owned is equally without merit or substance and adds nothing to establish probable cause that a crime has been committed based on the substance of the allegations contained in the affidavit . Nowhere in the affidavit does it allege that the contract was entered into or awarded to "IPM' because "IPM" was owned by a woman. Even if it were properly alleged, there is nothing in the affidavit that indicates there was a requirement that an owner of a corporation that had been awarded a job to perform security services on the building pending its transfer to Stratford had to be present at the business premises as opposed to delegating the management of the building to an employee, namely, Rich Meier. (¶ 9 alleges Meier was the operations manager for "IPM")

Paragraph 13 alleges that "AB" stored company property at "SAEP" No description is given of the property claimed to be stored or when it was stored or even if "CS-1" even personally observed any property. One could not conclude if the property was a hammer, tools or materials or whether it was used for the work which "CS-1" alleged "AB" performed at "IPM". Once again it is obvious that the information of "CS-1" as alleged in paragraph 14 is based on surmise and conjecture. ( "American Boiler's employee's <u>may have performed</u> unauthorized work . . . . CS-1 believed that American Boiler must have been at "SAEP")  (Affidavit ¶ 14)

Paragraph fourteen (14) adds nothing of any evidential value to support the probable cause necessary to believe a crime has been committed and that evidence of a crime would be found at the accounting office of Stavros Ganias. Once again, the paragraph uses terms like "may have performed unauthorized work" or that "he believed" that "AB" employees must have been at "IPM" over the weekend. There is nothing of substance in the allegations, as they appear to be based on surmise, conjecture and guesswork on the part of "CS–1".

5

Paragraph 15 makes reference to a conversation between McCarthy and John Ruggerio, the manager of security at "IPM"; but there is nothing to support or verify the substance of what was allegedly related, that is, "CS-1" never states he went to Building 67 and observed any cooling unit allegedly stored there. There is no evidence at all that would corroborate or establish anything was stored in building 67. In addition, there is no indication that the placing of a cooling unit in an empty building was a fraud committed upon the army or that would lead one to conclude a crime had been committed; or more importantly, that evidence relating to this incident would be found in the business office of the defendant.

The statements of "CS-1" contained in paragraph 17 are couched in terms of guesswork, surmise and speculation on his part. He relates he saw Ruggerio shredding some activity logs; yet there is no indication if they were old logs or if they had already been copied and backed up and placed into the computer and stored in the computer in building 12 as asserted in paragraph No. 17 of agent Conner's supporting affidavit. There is nothing of an illegal nature asserted in this paragraph and certainly nothing that would lead one to believe there is probable cause to believe evidence relating to this activity would be in Ganias' business office.

It would also appear from the statements contained in Paragraph 17 that the affiant, Special Agent Michael Conner, requested and had "CS-1" conduct a <u>warrantless seizure</u> of "IPM's" "security tapes". ("During this visit, the individual obtained recent security tapes at my request.") (¶17) In any event, there is no evidence or assertion in Agent Conner's affidavit that the tapes showed any illegal activity or evidence of criminal activity.

Paragraphs 20- 27, which detail certain observations and statements of "CS-2" do not add to or support a probable finding that a crime has been committed or that evidence of a crime would

6

be found in the office of Stavros Ganias. The fact that she may have opined that Lynn McCarthy did not sign her layoff slip is of no moment in this regard. Similarly, her statement that she thought the signature was similar to those on government contracts is equally unimportant, because the reader has no information of whether or not she is basing this opinion on her memory of contracts she may have seen in years past or a current document. Nor does she indicate how she familiar she is with Lynn McCarthy's signature. Regardless of her familiarity with her handwriting, there is nothing of an illegal nature, based on the allegations in the warrant, with someone getting a layoff or termination notice from someone authorized to sign on her behalf. In any event, these assertions fail to support a finding of probable criminal activity and or support a finding of probable cause to search Ganias' office.

Of some import, for purposes of where evidence might reasonably be found, to consider the statement from "CS-2" that contract files were kept in a locked safe in Building 12, along with the employee time cards. (¶ 27) They therefore would not reasonably be found at the defendant's business premises.

Paragraph 29 contains rank hearsay and adds nothing to support a finding that a crime was probably committed and that evidence of a crime would be found in Ganias' office. It is clear that the affidavit is devoid of any fact or allegation that the government was ever submitted a bill for which they had to pay- over and above their price fixed contract.

The affidavit states that searches of computers can take two weeks or months to complete and have to be performed by specially trained agents. (¶ 32)  *Paragraph 33 states the computers in question, which are referred to in attachment "B" are presently located at 550 Main Street in Stratford, Connecticut.* This is not the address of the business office of Stavros Ganias. Paragraph

33 also alleges that <u>under Rule 41</u> of the Federal Rules of Criminal Procedure, the government is authorized to seize and <u>retain evidence</u> and instrumentalities of a crime <u>for a reasonable time</u> and to examine, analyze, and test them.  Here the seizure of information related to Stavros Ganias and his business was not only beyond the scope of the warrant-but it was <u>held for an unreasonable amount</u> of time, that is, two years and five months from the court authorized search for records of "IPM" and "AB" which took place on November 19 2003.

Finally, at the conclusion of all of the agent's assertions contained in his affidavit, Special Agent Conner, states that he believes there is probable cause to believe that IPM, James McCarthy and others have violated Title 18, United States Code, Sections 287 (false claims) and 641 (theft of Government Property), among other violations and that there is **probable cause to believe that evidence, fruits, and instrumentalities of these crimes, as more fully described in Attachment B, can be found on the premises of 550 Main Street, Stratford, Connecticut as more fully described in Attachment A to this affidavit**.  There is no doubt that there is a conflict between what the affiant states he feels he has probable cause to search, as asserted in the body of the affidavit and that as described in Attachment A.

Two factual showings have to be made in order to obtain a search warrant for a particular place or residence.  First it must be established that a crime took place and second, that there is probable cause to believe the evidence of such crime is located at the particular place in question. Probable cause exists where the totality of facts presented would lead a man of reasonable caution to believe that a crime has been committed and that evidence of that crime would be found in the place to be searched.  See *Davis v. Gracey*, 111 F.3d 1472, 1478 (10th Cir 1997).  Here there was no credible evidence presented to establish a crime or criminal activity.  The statements of CS-1 and

CS-2 as set forth above do not provide any reasonable probability that a crime was being committed based on the allegations contained in the affidavit of Agent Conner.

  2. <u>No authority given by the warrant to make a mirror image of the hard drives</u>.

The search warrant did not give the agents authority to make a "mirror image" of the defendant's three (3) computer hard drives. The warrant limited the seizure to " [A]ll books, records . . . . computer hardware and software and computer associated data relating to the business, financial and accounting operations of Industrial Property Management ("IPM") and American Boiler, Inc. . . . Here the agents chose to make a mirror image of the computers, rather than search the computers on scene. The warrant only gave them permission to take those files and data related to "IPM' and "AB". (¶ 2 Attachment B of Warrant) Here they confiscated all the defendant's co-mingled information for his entire clientele and business by making a "mirror image" of all three of his computers and their entire contents.

The affidavit in support of the warrant indicated that the searching and seizure of information from a computer usually requires it to be searched by a qualified expert in a laboratory or other controlled environment. (¶ 34 ) The affidavit went on to relate that Rule 41 of the Federal Rules of Criminal Procedure allow the government to seize and retain evidence and instrumentalities of a crime for a reasonable time, and to examine and analyze, and test them. (¶33). In spite of the affidavit and its assertions, the warrant never authorized the removal of the computers from the business premises of the defendant to be examined off premises. Compare *United States v. Hay* 231 F.3d 630 , 637 (9th Cir. 2002) ("the affidavit explained why it was necessary to seize the entire computer system: and "justified taking the entire system off site because of time, expertise and controlled environment required for a proper analysis". *United States v. Adjani*, 452 F. 3d 1140, 1149
9

n.7 (9th Cir. 2006).

    3. <u>The warrant was a "General Warrant" and lacked "Particularity"</u>

The warrant of November 17, 2003 lacked the particularity necessary to describe the things to be seized. The Fourth Amendment requires that every warrant particularly "describ[e]" two things: "the place to be searched" and the "persons or things to be seized." U.S. Constitution 4th Amendment; see *United States v. Grubbs*, 547 U.S. 90, 97 (2006). The purpose behind the particularity requirement is that it tell the officers how to separate the items properly subject to seizure from irrelevant items. See *Marron v. United States*, 275 U.S. 192, 296 (1927). Nothing is therefore left to the discretion of the officers executing the warrant. *Davis v. Gracey*, 111 F. Ed 1472, 1478 (10th Cir. 1997) Second, the description of the things to be seized should be limited to the probable cause established in the warrant. See *In re Grand Jury Investigation Concerning Solid State Devices, Inc.*, 130 F. 3d 853, 857 (9th Cir. 1997). Considered together these elements forbid agents from getting "general warrants" and instead require them to conduct narrow searches that attempt to minimize unwarranted intrusions upon privacy. See *Anderson v. Maryland*, 427 U.S. 463, 482, n.11(1976).

The warrant was general in nature in that it allowed the wholesale seizure of all the business and tax records from the defendant and Taxes International and its clients. Paragraph one (1) of Attachment "B", the "LIST OF ITEMS TO BE SEIZED" set forth the items that authorized for seizure from the defendant's business office. Agent Conner's affidavit made it clear that Ganias did accounting and tax preparation. It could be reasonably inferred that he had other client's records and files co-mingled on those computers with that of IPM and American Boiler. By allowing the indiscriminate seizure of each and every business computer, the warrant thereby became "general"

10

in nature; without proper safeguard for its execution and it authorized access to all records and files possessed by the defendant and which had nothing to do with IPM or American Boiler.

In order to minimize the inherent problems with the search of computer that may have contained records authorized for seizure by the warrant, as well as other numerous co-mingled records not authorized for seizure, proper safeguards or protocols for the search should have been established to insure the search would pass constitutional muster. The Ninth Circuit has been quite active in the analysis and development of case law in the field of computer searches, especially where there is a likelihood of co-mingled records of others, in addition to those materials subject to seizure under the search warrant. See *United States v. Comprehensive Drug Testing,* 513 F. 3d. 1085, (9th Cir. 2008)(Order taking case En Banc: 545 F. 3 1106 (9th Cir. 2008)(En Banc order 564, August 26, 2009; case No. 05-10067)

The underlying facts in Comprehensive Drug Testing (*CDT*) dealt with the issuance of a search warrant upon CDT for the drug testing records of 10 major league baseball players, whose records were mixed or co-mingled with the records of many other individuals. The government seized the records but reviewed the drug testing records of hundreds of players in addition to the ten they were authorized to seize and review. The search warrant in CDT was not unlike the initial warrant in the instant matter. The warrant recited numerous reasons for allowing the search of the computer records of CDT at an off site location. ( Special personnel needed, special programs, maintain integrity of evidence, etc....)  The warrant contained certain procedures ( hereinafter referred to as "Tamura procedures") on how the seized data was to be handled. This was done so that the data beyond the scope of the warrant would not fall into the hands of the investigation agents. In essence the court required a screen team that would conduct the search and tun the data over to

11

the investigating agents. Those items not within the scope of the warrant were to be returned to CDT within a reasonable time, not to exceed 60 days, unless further authorized by the court. In CDT the investigating case agent reviewed the seized computer data, including the unauthorized data, and used it to obtain other search warrants. "The point of the Tamura procedures is to maintain the privacy of materials that are intermingled with seizable materials and to avoid turning a limited search for particular information into a general search of office file systems and computer databases." *United States Court of Appeals*, En Banc ruling, No. 0510067 at 11876. The government also failed to have the computer personnel conduct the initial review of the data and to segregate materials not the object of the warrant for return to their owner.

      The whole point of the Tamura guidelines, was to insure that a warrant for "specific items" wasn't converted into a "general warrant" which is constitutionally impermissible. In order to guard against such future unlawful conduct the Ninth Circuit has specified what should normally be included in future warrant applications. The following recommendations were made: (1) a protocol for preventing the investigation agents from examining or retaining any data other than that for which they have probable cause; (2) trained computer personnel to examine and <u>segregate the date</u>, who are not part of the investigating team; (3) once the relevant material has been turned over to the investigation agents, any <u>remaining copies must be destroyed, or returned</u> to the party from whom they were seized, along with the actual physical medium that may have been seized (such as the computer or hard drive); (4) the government <u>may not retain copies</u> of such returned data, unless it obtains judicial approval; (5) the seizing agent must make a return to court describing what materials were seized and <u>what materials were returned to the party</u> from whom it was seized and (6) the return must include a sworn certificate that the government had destroyed or returned all copies of

data not authorized by the warrant.

B. SEARCH WARRANT # 2- (Search of the mirror imaged hard drives)

Search warrant # 2, which was signed on April 24, 2006 and it authorized the search of the "mirror imaged" hard drives of the defendant's three business computers seized during the execution of the first warrant at the defendant's business in Wallingford, Connecticut on November 19, 2003. (Exhibit # 4 warrant of April 24, 2006) On November 19, 2003, the agents, instead of seizing the defendant's computers, made "mirror images" of the three computers and conducted their search of the computers off premises. The three mirror imaged copies of the defendant's computers contained the co-mingled computer records, files and documents of his entire business practice and his clients. The affidavit in support of the second warrant was submitted by Special Agent Hosney.

1. The retention of the defendant's files was "unreasonable"

The retention of the files and records of the defendant from the first search for almost two and half years after their seizure was patently unreasonable and unlawful. The first warrant only authorized a search and retention of the records of "AB" and "IPM" records. The agents conducted a complete seizure of all the defendant's business records which were located in his three computers. (¶2 of Attachment "B"of first search warrant. The affidavit in support of such warrant acknowledged the agents right only to keep such evidence for a reasonable amount of time. (¶33) As with any search, "the manner in which a warrant is executed is subject to later judicial review as to its reasonableness." *Dalia v. United States*, 441 U.S. 238, 258 (1979); *United States v. Ramirez*, 523 U.S. 65, 71 (1998). ("the general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant.). The Fourth Amendment requires that forensic analysis of a computer be conducted within a reasonable time. See *United*

*States v. Mutschelknaus*, 564 R. Supp.. 2d 1072, 1077 (D.N.D. 2008).

Special Agent Hosney authored the affidavit in support of the application for the search warrant for the records of the defendant and his business which were contained on the three "mirror imaged" hard drives of the defendant's computers. ( See Exhibit #5 - a copy of the application and affidavit in support) Paragraph 9 of the affidavit indicates that Special Agent Hosney used information transmitted to her by "Army CID" who initiated the investigation. That IPM was on a fixed cost contract from the time they contested the loss of the September 30, 2002 bid that they lost. (¶ 9) That the agents in the first search on November 19, 2003 took financial documents belonging to the McCarthy's. (¶ 11) It is submitted that these were outside the scope of the warrant and should therefore be suppressed.

Agent Hosney also reviewed the notes of Army CID Special Agent, David Shaver, and they indicated that TaxInt_2 was the primary computer for Taxes International. (¶ 13) Any information related to Taxes International or opinions derived by agent Shaver from his search and review of these computers, outside the materials for which search warrant #1 authorized, was improper and evidenced the fact that a general search was conducted on November 19, 2003.

Agent Hosney was also provided with information that computer TaxInt_ 2 contains a quick books file titled Steve_ga.qbw and that she believed this file contains the financial records of Steve S. Ganias dba Taxes International. (¶ 27)

The information contained in paragraphs 13 and 27 show that the government treated the initial search warrant as a "general warrant" and copied information and took notes on files and noted file designations which were outside the scope of the first search and seizure warrant authorizing the seizure of records relating to "AB" and "IPM". The taking of notes and notations

by Agent Shaver or materials and information outside the warrant is exactly the type of conduct that the Court of Appeals found so egregious in *CDT*. It is this type of conduct that a "proper protocol" for the seizure and the retention of the court authorized materials and the purging or destruction of those materials not authorized by the warrant is designed protect against and thereby insure that a warrant authorizing the seizure of specific records and information is not transformed into a "general warrant".

C.      RELIEF REQUESTED:

This Court should suppress any and all evidence derived from the search of the three imaged hard drives in possession of the government and which were authorized by the search warrant dated April 26, 2006 for the following reasons: (1) the government was in possession of the three imaged hard drives without prior court authority or approval to make and retain said hard drives and said possession was therefore unlawful; (2) the government was in possession of seized property, not authorized by a valid warrant, for an unreasonable amount of time following the completion of a search for specific items under warrant # 1; (3) the government should have acted in a "reasonable manner" in their execution of the first warrant and should have returned, destroyed or purged the materials on the imaged hard drives that did not relate to those materials authorized for seizure by Warrant # 1 and (4) the possession of the three hard drives was pursuant to "general warrant" and all evidence derived from that search, including the making of the three images hard drives, should be suppressed as fruit of the poisonous tree.

In the alternative, the defendant should be granted an evidentiary hearing to determine the reasonableness or not, of the scope and extent of the search conducted by the investigation agents and their computer experts, on the defendant's imaged hard drives.

15

Respectfully submitted,
THE DEFENDANT, STAVROS GANIAS

BY: /s/ Robert A. Lacobelle
Robert A. Lacobelle
Byrne & Lacobelle, P.C.
799 Silver Lane
Trumbull, CT 06611
203.377.7957
Fax: 203-375-5003
Fed. Bar No.: ct09571
rlacobelle@yahoo.com

**CERTIFICATION**

I hereby certify that on February 27, 2010, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

s/ Robert A. Lacobelle
Robert A. Lacobelle